# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39606**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Robert J. HERNANDEZ**
Airman Basic (E-1), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 8 October 2020[1]

————————————

*Military Judge:* John C. Degnan.

*Approved sentence:* Dishonorable discharge and confinement for 60 days. Sentence adjudged 12 September 2018 by GCM convened at Vandenberg Air Force Base, California.

*For Appellant:* Major Stuart J. Anderson, USAF (argued); Colonel Michael A. Burnat, USAF; Major Rodrigo M. Caruço, USAF.

*For Appellee:* Major Jessica L. Delaney, USAF (argued); Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Captain Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

*Amicus Curiae for Appellant:* A.J. Colkitt (law student, argued); Scott E. Thompson, Esquire (supervising attorney); Hannah Harris (law student); Ashley Pollard (law student)—Liberty University School of Law.

*Amicus Curiae for Appellee:* Rebekah L. Meier (law student, argued); Rena M. Lindevaldsen, Esquire (supervising attorney); William B. Baker (law student); Tanner W. Havens (law student); Christiana H. Johnson (law student)—Liberty University School of Law.

————————————

[1] We heard oral argument in this case on 20 February 2020 at Liberty University School of Law, as part of this court's Project Outreach.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Senior Judge POSCH joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of wrongful use of cocaine in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a.[2] The military judge sentenced Appellant to a dishonorable discharge and confinement for 60 days, and the convening authority approved the sentence as adjudged.

On appeal, Appellant raises two issues. First, he asserts the military judge erred by denying his motion to suppress the results of his urinalysis. Second, he argues a sentence including a dishonorable discharge for a single use of cocaine is inappropriately severe. Because we conclude the military judge erred in not suppressing the urinalysis results, we do not reach Appellant's second issue.

## I. BACKGROUND

This appeal arises from Appellant's second court-martial. Appellant was previously sentenced to 15 months of confinement and a bad-conduct discharge for cocaine-related offenses and other crimes he pleaded guilty to. Rather than being placed on appellate leave when he was released from that period of confinement in late February 2018, Appellant was returned to Vandenberg Air Force Base, California. His leadership initially required him to live off-base, but eventually assigned him an on-base dormitory room which he moved into on 9 March 2018. Appellant was apparently assigned no military duties until the end of that month. While living in this dormitory room, Appellant's urine was seized pursuant to a search authorization, and the subsequent analysis of the urine tested positive, leading Appellant to be charged with using cocaine

_____

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

and tried at his second court-martial. The focus of this opinion is the legality of that seizure.

The sequence of events leading up to Appellant's urine being seized began in early April 2018 when a Security Forces member, Senior Airman (SrA) AC, went to visit a friend who lived in the same dormitory building Appellant was assigned to. Noticing a strong scent of marijuana in the building, SrA AC reported the smell to his supervisor, and a four-person team of Security Forces personnel was dispatched on 3 April 2018 to further investigate. The team consisted of SrA AC, Investigator JM, Staff Sergeant (SSgt) AM, and SSgt PO. They were accompanied by Jager, a German Shepherd military working dog for which SSgt PO was the assigned canine handler. Appellant was a member of the same squadron as those on the investigative team, and all the team members were aware of Appellant's prior drug-related court-martial.

At the dormitory building, the team could smell marijuana as soon as they entered the building. They found nothing noteworthy on the first floor, so they proceeded up to the second floor where Appellant's room was located. At the top of the stairs, they opened the door to a common hallway leading to 14 rooms. As soon as they did so, Jager sat down, which was his signal that he smelled one of the five drugs he was trained to detect.[3] After obtaining legal advice, the team decided to seek consent to search the rooms of residents who happened to be in the dormitory at the time, searches which involved Jager doing a brief walkthrough of those rooms.[4] Midway through this effort, Appellant walked out of his room and was stopped in the hallway by the investigative team. SSgt AM asked Appellant if they could search his room, and Appellant agreed.

Appellant, Investigator JM, and SSgt AM were standing in the hallway next to the door to Appellant's room as SSgt PO brought Jager over to search the room. When SSgt PO and Jager walked up to the door, Jager sat down in front of Appellant. Investigator JM asked Appellant for consent to search his person, which Appellant granted. Investigator JM found nothing notable. Meanwhile, SSgt AM searched Appellant's backpack—also with Appellant's consent—finding nothing. Jager did not indicate he detected any drugs in the room, but upon leaving the room Jager sat down in front of Appellant again and "stared at" him.

---

[3] Two of those drugs include marijuana and cocaine, but Jager's alert signal was the same for all the drugs he was trained to detect.

[4] According to the notes SrA AC took at the time, the team was able to search 10 rooms in the building, but were unable to search an additional 25 rooms.

The team released Appellant, who did not exhibit any obvious symptoms of being under the influence of a controlled substance, and continued their investigation. Jager alerted one more time on the third floor when the door to a hallway was opened, but no drugs were found in the team's limited search of the building. At some point during the search, SrA AC spoke with one of the residents who said she smelled marijuana in the building on 2 and 10 March 2018—both before and after Appellant moved into the dormitory.

The day after the search, SSgt AM drafted an affidavit and requested authorization from the military magistrate, Colonel (Col) PN, to seize a urine sample from Appellant. In making this request, SSgt AM read his affidavit to Col PN over the phone. Col PN, who knew Appellant had been incarcerated as a result of his prior drug-related court-martial, gave SSgt AM verbal authorization, and Appellant was taken to the base drug demand reduction office where he provided a urine sample which subsequently tested positive for a metabolite of cocaine. Although the investigators sought legal guidance during their search of the dormitory building, there is no evidence SSgt AM discussed his affidavit with the legal office or that Col PN sought legal advice before providing search and seizure authorization.

At trial, Appellant sought to suppress the urinalysis results. During the hearing on this suppression motion, Jager's handler, SSgt PO, testified that Jager had been trained to detect actual drugs as well as the "residual odor" of drugs. Training for residual odors involved using sponges which had absorbed the scent of the pertinent drug, but did not actually contain the physical drug itself. SSgt PO further testified that military working dogs cannot detect drugs in the human body, that Air Force regulations prohibit using working dogs to search people, and that the dogs are not trained to search people.[5] He explained he had never previously seen Jager or any other military working dog alert on a person, although Jager would be capable of picking up the odor of drugs on a person. SSgt PO testified that he explained to SSgt AM while they were in the dormitory that Jager does not normally alert on people. He further testified he had never seen Jager respond on a person, nor had he seen other drug dogs do so in his career as a canine handler. He said he told SSgt AM that it was "not normal" the first time Jager sat in front of Appellant, and he told SSgt AM it was "not usual" after the second alert. SSgt PO testified that SSgt AM did not

---

[5] The Defense provided the military judge an excerpt from Air Force Instruction 31-121, *Military Working Dog Program* (2 May 2018), which noted in relevant part, "Detector dogs will never be used to search a person." ¶ 4.2.2.1. SSgt PO explained that this prohibition is based on safety concerns, testifying that, "You could have an aggressive dog and an aggressive dog with a stranger, nine out of ten times he's going to bite the individual being that close."

contact him or ask any follow-up questions before seeking the search authorization.

SrA AC also testified on the suppression motion, explaining that he told SSgt AM that the dormitory resident he spoke to had said she smelled marijuana in the building on dates which were both before and after Appellant moved in. He testified SSgt AM asked him what days the resident had smelled marijuana, and he gave SSgt AM both dates. SrA AC also provided the military judge the notes he took during the investigation which reflected the two dates the resident said she had smelled the odors. SSgt AM testified as well, and he said that Jager alerted twice on the door to Appellant's room in addition to the two times he sat in front of Appellant. This, however, was disputed by SSgt PO, and the military judge ultimately rejected SSgt AM's testimony about Jager alerting twice on Appellant's door in his ruling on the suppression motion.

SSgt AM's affidavit supporting his request for the search authorization explained SSgt AM had been an investigator for about seven months and that he had worked on eight criminal investigations during this time. He described the investigation of the dormitory building and included the claim Jager twice alerted on Appellant's door in addition to sitting in front of Appellant twice as well as in the second- and third-floor hallways. The affidavit explained the team "conducted consensual searches of the residants [sic] who were home at the time" on the second and third floors, but did not specify the number or percentage of rooms the team was able to search. His affidavit included the fact the dormitory resident SrA AC had spoken to said she smelled marijuana in the building on 10 March 2018, after Appellant had moved in. SSgt AM, however, omitted the fact the resident had smelled marijuana on 2 March 2018, before Appellant moved in. SSgt AM's affidavit also failed to disclose either that Jager could not detect drugs within the human body or that SSgt PO had explained Jager sitting in front of Appellant was not normal or usual. The affidavit contained no information about Jager's training or capabilities at all, but it did note that Appellant "was previously serving punitive actions for drug related charges prior to returning back to Vandenberg [Air Force Base] to out-process." At the end of the affidavit, SSgt AM wrote that he was requesting authorization to search Appellant's person "for a urine sample and urinalysis," without any additional explanation as to why he believed such a search was warranted or what evidence he believed would be found.

Col PN testified that he granted search authorization after SSgt AM called him and read the affidavit to him. In summarizing the facts he took into account in making that determination, Col PN said he considered "[t]he fact that the dog sat on [Appellant's] floor, and sat when he came out, and sat each time it passed his room, and then on the second floor that someone actually could— said that the smell of marijuana started the day after [Appellant] moved back

into the dorms." When asked by trial defense counsel whether he considered the possibility that Jager might have alerted to the overall strong smell of marijuana in the dormitory building, Col PN answered, "No, because it sat next to him. It sat next to his door and not anybody else or any other door." Col PN explained that one of his duties at the time included certifying military working dogs, which involved reviewing the dogs' performance histories. Although he did not specifically recall certifying Jager, Col PN said he would assume Jager had been certified by virtue of the fact he was being used in an investigation. Col PN further testified he believed Jager was alerting to "some kind of controlled substance," but when asked where he thought such a substance might have been, Col PN answered, "In [Appellant's] clothes, his hair, his skin. I couldn't say, but [Jager] was hitting on something." Col PN also testified he knew Appellant had been in confinement, and he thought Appellant had been convicted for using "cocaine and marijuana," but he said the drug cases at the base "all blended together after a while." Appellant, in fact, had only been convicted of cocaine-related offenses.

The Defense argued probable cause was lacking for seizing and searching Appellant's urine and that the good faith exception set out in Mil. R. Evid. 311 did not apply based upon SSgt AM omitting "a lot of important facts" from his affidavit, such as: that the entire building Appellant lived in smelled of marijuana; not every room was searched; Jager does not ordinarily alert on people; military working dogs are not authorized to be used to search people; and that the dormitory building smelled of marijuana before Appellant had moved in. Trial defense counsel said they did not intend to "alleg[e] any improper conduct on [SSgt AM]," but they said the affidavit "pose[d] some concerns," did not present a "fair picture" of the investigation of the dormitory building, and that some portions of the affidavit were "misleading," such as the suggestion that the building only smelled like marijuana after Appellant moved in, which trial defense counsel characterized as "just not true." In concluding his argument, trial defense counsel said,

> [B]ecause I think that the affidavit was insufficient, I think that it just didn't include all of the facts and circumstances of what actually occurred. It included, you know, I don't want to say false, but misleading information and just didn't include the full picture. I don't think that the good faith exception should apply in this case.[6]

The Government argued Jager could detect the residual odor of drugs on Appellant's person and that "there is a logical connection between [Jager]

---

[6] Trial defense counsel argued "the second and third prongs" of the good faith exception in Mil. R. Evid. 311(c)(3) "are not met."

smelling residuals on [Appellant's] person and a reasonable belief that he recently ingested a controlled substance." The Government's theory was that Jager's alert indicated Appellant "had either just smoked drugs or just handled drugs thus providing probable cause he ingested drugs." Trial counsel argued that even if probable cause was lacking, the good faith exception should apply, specifically claiming there was no evidence SSgt AM intentionally or recklessly failed to include any particular information.

The military judge denied Appellant's motion to suppress the urinalysis results, ruling that Col PN had sufficient probable cause to authorize the seizure and subsequent search of Appellant's urine. In his written ruling, the military judge adopted all the facts in SSgt AM's affidavit, with the exception of the assertion that Jager alerted twice on Appellant's door. The military judge further adopted most of the facts asserted in the Defense's written suppression motion, but those facts largely mirrored SSgt AM's affidavit, adding little new information. In his analysis, the military judge pointed to the fact the dormitory resident said she smelled marijuana on 10 March 2018, but he did not address the fact she also smelled it before Appellant moved in, nor did he discuss the omission of that fact from SSgt AM's affidavit. The military judge noted Jager alerted "when he passed by [Appellant] before and after searching his dorm room," but he neither referred to the fact Jager was not capable of detecting drugs inside of Appellant's body nor that Jager was not trained (or even allowed) to search people due to safety concerns. The military judge did not explain how the detection of the scent of drugs outside a person's body yields probable cause of locating evidence of drug use within a person's body. Instead, the military judge simply noted the evidence was "clearly enough" to support the search authorization, even after excising the claim Jager alerted twice on Appellant's door. The military judge alternatively concluded that if probable cause was lacking, the good faith exception in Mil. R. Evid. 311(c)(3) would apply. In so concluding, he ruled "the information in the authorization was not false or reckless; Col [PN] was not a 'rubber stamp' nor did he abandon his judicial role; the authorization contained more than enough probable cause . . .; and the authorization was not facially deficient."

## II. LAW

A military judge's ruling on a motion to suppress evidence is reviewed for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). Such an abuse occurs when a military judge's findings of fact are clearly erroneous or the judge's conclusions of law are based on an erroneous review of the law. *United States v. Hollis*, 57 M.J. 74, 79 (C.A.A.F. 2002) (citation omitted). We review de novo any conclusions of law on a motion

to suppress. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citations omitted).

## A. Probable Cause Requirement

The Fourth Amendment[7] to the United States Constitution protects the rights of individuals, including servicemembers, to be secure in their persons, houses, papers, and effects from unreasonable searches and seizures by requiring such searches and seizures to be based on probable cause. *United States v. Ezell*, 6 M.J. 307, 310 (C.M.A. 1979). The amendment "gives concrete expression to a right of the people which 'is basic to a free society'" and "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528 (1967) (quoting *Wolf v. Colorado*, 338 U.S. 25, 27 (1949)). The Supreme Court has explained the amendment's "protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws." *Weeks v. United States*, 232 U.S. 383, 392 (1914).

The Fourth Amendment applies when a person has a reasonable expectation of privacy. *United States v. Jones*, 565 U.S. 400, 406 (2012). Military servicemembers have such an expectation of privacy in the contents of their urine—both in the initial seizure of the urine and the later testing of it in a forensics laboratory. *See United States v. Dease*, 71 M.J. 116, 120–21 (C.A.A.F. 2012) (citations omitted); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . these intrusions must be deemed searches under the Fourth Amendment."). In such a case, a search must be based on probable cause or meet an exception to that rule. *See Skinner*, 489 U.S. at 619 (citations omitted).

A search conducted pursuant to a search authorization or warrant is presumptively reasonable. *Hoffman*, 75 M.J. at 123 (citation omitted). Nonetheless, "a warrant does not guarantee the constitutionality of a search or relieve the Government of the burden of establishing that the warrant did not authorize an unreasonable search." *United States v. Gurczynski*, 76 M.J. 381, 386 (C.A.A.F. 2017) (citations omitted).

The Military Rules of Evidence give force to the Fourth Amendment with respect to criminal proceedings involving servicemembers. Under Mil. R. Evid. 315(f)(2), a military search authorization "must be based on probable cause." Probable cause exists when there is a reasonable belief that the person, property, or evidence sought is located in the place to be searched. Mil. R. Evid.

---

[7] U.S. CONST. amend. IV.

315(f)(2). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and . . . the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (internal quotation marks and citations omitted). "Close calls will be resolved in favor of sustaining the magistrate's decision." *United States v. Monroe*, 52 M.J. 326, 331 (C.A.A.F. 2000) (quoting *United States v. Maxwell*, 45 M.J. 406, 423 (C.A.A.F. 1996)). A search authorization should not be found invalid by analyzing the underlying affidavit "in a hypertechnical, rather than a commonsense, manner." *United States v. Clayton*, 68 M.J. 419, 423 (C.A.A.F. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). In assessing the reasonableness of a search, we weigh the degree of the intrusion of the person's privacy against the degree to which the search promotes a legitimate governmental interest. *Gurczynski*, 76 M.J. at 386 (citing *Riley v. California*, 573 U.S. 373, 385 (2014)).

Our review of whether a search authorization is grounded in probable cause is not conducted de novo; rather we assess whether "the authorizing official had a 'substantial basis' for finding probable cause." *Hoffman*, 75 M.J. at 125 (citation omitted). "A substantial basis exists 'when, based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location.'" *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (quoting *United States v. Rogers*, 67 M.J. 162, 165 (C.A.A.F. 2009)). Probable cause requires the demonstration of "a sufficient nexus between the alleged crime and the specific item to be seized." *Id.* at 106 (citations omitted). In conducting this review, we look to the information that the authorizing official had at the time he made his decision. *United States v. Cowgill*, 68 M.J. 388, 391 (C.A.A.F. 2010) (citations omitted). When inaccurate information is included in the affidavit used in support of a request for a search authorization, we will sever that information and determine whether the remaining information supports a finding of probable cause. *Id.* (citing *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001)) (additional citation omitted).

We ordinarily afford the magistrate's determination of probable cause great deference, but we recognize three exceptions to this general rule: (1) when the affidavit upon which the determination was based was prepared with knowing or reckless falsity; (2) when the magistrate is not neutral and detached or is serving as "a rubber stamp" for the police; or (3) when the affidavit fails to provide a substantial basis for a finding of probable cause or the determination is "a mere ratification of the bare conclusions of others." *United States v. Carter*, 54 M.J. 414, 419 (C.A.A.F. 2001) (quoting *Leon*, 468 U.S. at 914–15).

**B. Exclusionary Rule**

Under Mil. R. Evid. 311(a), evidence seized pursuant to a deficient search authorization—one lacking probable cause—must be excluded unless an exception applies. *United States v. Perkins*, 78 M.J. 381, 386 (C.A.A.F. 2019). Even when evidence has been unlawfully obtained and when no exception to the exclusionary rule applies, the evidence is only inadmissible when "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a); *see also Herring v. United States*, 555 U.S. 135, 147 (2009); *United States v. Wicks*, 73 M.J. 93, 104 (C.A.A.F. 2014).

**C. Good Faith Exception**

One exception to the ordinary rule of exclusion is the so-called "good faith" exception under which evidence obtained as a result of an unlawful search or seizure need not be suppressed if it was obtained pursuant to the good faith execution of a search authorization. Mil. R. Evid. 311(c)(3) sets forth three requirements for this exception:

(1) the search or seizure executed was based on an authorization issued by a competent authority;

(2) "the individual issuing the authorization . . . had a substantial basis for determining the existence of probable cause;" and

(3) the person seeking and executing the authorization "reasonably and with good faith relied on the issuance of the authorization."

The United States Court of Appeals for the Armed Forces (CAAF) has explained that the second requirement is met if the person executing the search "had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *Perkins*, 78 M.J. at 387 (quoting *Carter*, 54 M.J. at 422). The question is "'whether a reasonably well-trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23). We further "consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Leon*, 468 U.S. at 923 n.24.

The Supreme Court has identified four circumstances in which the good faith exception will not apply: (1) where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the magistrate "wholly abandoned his judicial role;" (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so "facially

deficient . . . in failing to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citations omitted). The CAAF has harmonized these four exceptions with the three requirements under Mil. R. Evid. 311(c)(3) by finding *Leon*'s first and third exceptions to be incorporated in Mil. R. Evid. 311(c)(3)'s second prong (magistrate having a substantial basis) and *Leon's* second and fourth exceptions to be incorporated in Mil. R. Evid. 311(c)(3)'s third prong (good faith reliance on the search authorization). *Carter*, 54 M.J. at 421.

What amounts to a "reckless disregard" for the truth has not been precisely defined, but it does call for more than mere negligence on the part of the affiant. *United States v. Blackburn*, ___ M.J. ___, No. 20-0071, 2020 CAAF LEXIS 405, at *10–11 (C.A.A.F. 24 Jul. 2020). Our superior court has identified such conduct as ranging from "sheltering obvious reasons to doubt the veracity of the allegations" to "withholding a fact . . . that any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Id.* (alterations in original) (other alteration and internal quotation marks omitted) (quoting *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) and *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)). Federal courts have concluded recklessness may be inferred from the omission of evidence which is critical to the determination of probable cause. *See, e.g., Jordan v. Town of Waldoboro*, 943 F.3d 532, 544 (1st Cir. 2019); *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (citing *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)). We review the question of whether an affiant provided false information intentionally or with reckless disregard for the truth for clear error, as it is a question of fact. *Blackburn*, 2020 CAAF LEXIS 405, at *14 (citing *United States v. Allen*, 53 M.J. 402, 408 (C.A.A.F. 2000)).

### D. Issue Preservation

Whether we consider Appellant's particular arguments for the suppression of the evidence resulting from the seizure of his urine turns, in part, on whether Appellant has preserved the issue for our review. Under Mil. R. Evid. 311(d)(2)(A), the failure to object to or seek suppression of evidence obtained from an unlawful search or seizure prior to the entry of pleas waives the issue. *United States v. Smith*, 78 M.J. 325, 325–26 (C.A.A.F. 2019). Objections must be particularized, setting out the argument for suppressing the evidence, otherwise they are waived. *Perkins*, 78 M.J. at 389–90. "While there are no 'magic words' dictating when a party has sufficiently raised an error to preserve it for appeal, of critical importance is the specificity with which counsel makes the basis for his position known to the military judge." *United States v. Rich*, 79 M.J. 472, 475 (C.A.A.F. 2020). However, when the issue at hand is constitutional in nature, we apply "a presumption against finding waiver." *Blackburn*,

2020 CAAF LEXIS 405, at *9–10 (citing *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018)).

### III. DISCUSSION

Appellant argues the information presented to the magistrate was inadequate to support probable cause for the seizure and search of Appellant's urine, because the information did not demonstrate a fair probability that Appellant's urine contained evidence of drug abuse. Appellant further argues SSgt AM drafted his affidavit with a reckless disregard for the truth by omitting significant information, thereby rendering the good faith exception inapplicable in this case. Therefore, Appellant argues, the evidence obtained as a result of the seizure and search—that is, the positive urinalysis results—should be suppressed. We agree.

### A. Probable Cause

We begin our review with the search authorization itself, and we must determine whether or not the authorizing official, Col PN, had a substantial basis for finding probable cause for authorizing the seizure and search of Appellant's urine. In conducting this analysis, we turn to SSgt AM's affidavit, which provided Col PN with the information he used to make his determination. As discussed above, SSgt AM's affidavit both excluded pertinent information and included information which was inaccurate. Reduced to its key components, the information presented to Col PN was that: (1) Appellant lived in a dormitory which began smelling like marijuana smoke the day after Appellant moved in; (2) Jager alerted on Appellant's hallway once, Appellant's door twice, and Appellant himself twice; and (3) Appellant had previously faced drug-related charges. The first piece of information is significant in that it permits the inference that because the dormitory only started smelling like marijuana smoke immediately after Appellant moved in, Appellant was likely the source of that smell, which would only exist by virtue of burning marijuana. In other words, the timing would suggest Appellant moved into the dormitory and promptly started smoking marijuana, creating the smell which persisted through the date of the dormitory investigation. SSgt AM's affidavit, however, omitted the fact the witness who provided the information about the building smelling like marijuana supplied not one, but two dates, which indicated the dormitory had that same smell a week before Appellant moved in. Such detail, had it been included in the affidavit, would have eliminated the significance of the first piece of information Col PN received, as it sharply undermines the inference that Appellant had been the one who introduced marijuana to the dormitory in early March 2018, undermining the notion that Appellant was smoking marijuana at all. The more obvious conclusion is the marijuana odor that existed when Appellant moved in was caused by someone else, not Appellant.

The second piece of information Col PN received—Jager's alerts—was partially incorrect, as Jager did not alert on Appellant's door at all, let alone twice. The military judge rejected this claim, as do we. Considering Jager alerted twice in front of Appellant himself, the elimination of the two alerts on his door does not undermine the notion Jager alerted in Appellant's vicinity. The inclusion of these additional alerts, which occurred after Appellant had departed the area, would lead to the conclusion that a residual odor of a controlled substance existed at the entry to Appellant's room. Such a conclusion, however, would seem to be rendered less significant, or at least more ambiguous, by the fact Jager did not alert inside of Appellant's room. In any event, Jager's two alerts immediately in front of Appellant are the most significant points here, because they indicate a controlled substance or the residual odor of a controlled substance existed either on or near Appellant himself. Eliminating the two alerts on the door from the probable-cause analysis arguably enhances the focus on Appellant, as one could infer that the absence of the later alerts indicates the drug evidence was on Appellant's person in that it disappeared when Appellant himself left the area.

By including the omitted date of the smell of marijuana and excluding the reference to two alerts on Appellant's door, Col PN was left with Jager's alert on Appellant's hallway and his two alerts in front of Appellant, along with the fact Appellant had previously faced drug-related charges. A drug detection dog's alert can, in and of itself, be the basis for a probable cause search for the drugs themselves. *United States v. Boisvert*, 1 M.J. 817, 819 (A.F.C.M.R. 1976). In *Boisvert*, the Air Force Court of Military Review found that "[w]hen a dog has been trained to detect the odor of drugs and this capability has been proven, sufficient probable cause exists to search any person or property upon which such a dog has alerted." *Id.* The United States Court of Military Appeals similarly found that "[c]onsidering the proven capability of [a] dog to detect the odor of marijuana," that dog's alert on a vehicle arriving at a checkpoint provided "sufficient probable cause to search the [vehicle's] occupants." *United States v. Unrue*, 47 C.M.R. 556, 560 (C.M.A. 1973). The CAAF later found sufficient probable cause to search an Airman's stereo speaker "[b]ased on the demonstrated reliability of [a] drug dog's ability" to detect the odor of marijuana. *United States v. Jackson*, 48 M.J. 292, 296 (C.A.A.F. 1998). The common thread tying each of these cases together is the concept of reliability: for probable cause to exist for a search based upon a drug detection dog's alert, that dog must have a "proven capability" and "demonstrated reliability" to detect illegal drugs. *See Jackson*, 48 M.J. at 296; *Unrue*, 47 C.M.R. at 560; *Boisvert*, 1 M.J. at 819; *see also United States v. Alexander*, 34 M.J. 121, 125 (C.M.A. 1992). Here, SSgt AM's affidavit included no information about Jager's qualifications, capabilities, or past performance. Col PN, however, was personally responsible for certifying the working dogs, which meant Col PN would review

the dogs' performance history. Despite not recalling whether he certified Jager, Col PN understood the certification process and presumed Jager had been certified either by himself or someone acting in his stead. Viewing these facts in the light most favorable to the Government, we will infer Jager had a demonstrated capability to detect the five drugs he was certified on.

What is entirely absent from the evidence and what we will not infer is Jager's capability to detect drugs inside of a person—specifically, the remnants or metabolites of drugs within a person's bodily fluids (at least so long as those fluids remain inside the person). Col PN was provided no information from which he could conclude Jager had the ability to detect drugs inside of a person, the evidence of which might be found in a urine sample seized from that person. SSgt PO testified Jager did not have the capability to do so, and considering the Air Force prohibits using military working dogs to search people out of safety concerns, we see no basis for Col PN to conclude otherwise. Col PN's own testimony further indicates that he did not believe Jager could or did detect evidence of Appellant's drug use inside of Appellant's body, as when he was asked what he thought Jager was alerting to when he sat next to Appellant, Col PN said the controlled substance would have been "[i]n his clothes, his hair, his skin. I couldn't say, but [Jager] was hitting on something." Notably absent from Col PN's list of possibilities is the suggestion that Jager was alerting to drugs inside of Appellant's body.

Col PN was aware of Appellant's prior drug-related conviction, and SSgt AM's affidavit generically noted Appellant "was previously serving punitive actions for drug related charges." Col PN, however, was uncertain what drugs Appellant had been convicted of being previously involved with and mistakenly surmised those drugs included both marijuana and cocaine. The notion that a magistrate's awareness of a subject's criminal history lends support to a finding of probable cause for a search authorization has some basis in military justice precedent. *See United States v. Stuckey*, 10 M.J. 347, 363 (C.M.A. 1981) (citations omitted) (a commander authorizing a search "may have seen police reports concerning a suspect or know of his reputation, prior convictions, or nonjudicial punishments. Some of the commander's information may be . . . of sufficient reliability so that . . . it would help support a search warrant.").[8] But our superior court has cautioned this premise comes with the significant caveat

---

[8] The military judge did not analyze the impact of Appellant's prior conviction in his ruling; however, amicus counsel for the Government argues the prior conviction should be considered as a basis for finding probable cause. The Supreme Court has concluded such information is not "entirely irrelevant," but has rejected the argument that a previous criminal record alone may support probable cause, as such a conclusion "would be to hold that anyone with a previous criminal record could be arrested at will." *Beck v. Ohio*, 379 U.S. 89, 97 (1964).

that a magistrate's failure to obtain evidence under oath when feasible to do so "has neglected a simple means for enhancing the reliability of his probable cause determination," which "may prove fatal" to a finding of probable cause in a marginal case. *Id.* at 364–65. Here, SSgt AM's affidavit was notably vague with respect to Appellant's prior misconduct. There is also no indication Col PN sought to clarify the nature of Appellant's prior conviction or its underlying misconduct, as had he done so he would have known Appellant's prior conduct did not involve marijuana, which was the subject of the dormitory search. Even viewing Appellant as someone who was known to have generally abused controlled substances in the past by virtue of his conviction, we do not find that fact provided support for the magistrate's probable cause determination here given the absence of any attempt to obtain greater detail about Appellant's prior misconduct. The significance of Appellant's earlier conviction is also minimized by the fact the charged timeframe of Appellant's prior misconduct terminated more than a year before Col PN provided his search authorization. Therefore, we conclude Appellant's prior conviction provided negligible support for concluding Appellant's urine contained evidence of drug use a year later.

Viewing the evidence in the light most favorable to the Government, Jager provided Col PN with probable cause to believe that Appellant had drugs or the residual odor of drugs on or near him. Col PN did not have probable cause to believe Appellant had drugs *in* him. The Government argues that taking Jager's alert together with the fact no drugs were found during the search of Appellant and his belongings allowed Col PN to deduce Appellant had ingested the drugs. Notably, Col PN did not testify he made that deduction. Moreover, we are not convinced that a person who has the odor of controlled substances on or near them, without more, gives rise to probable cause to believe the person has evidence of drug use in their urine. Although Jager's alert indicated the odor of drugs on or near Appellant, giving rise to the possibility Appellant had handled and used drugs, leaving some degree of residue or odor on his person, it seems equally possible Appellant had handled, but not used, drugs, or that he was simply wearing clothes which had absorbed the odor of drugs independently of any use by Appellant. Perhaps Appellant had previously kept drugs in his pocket at some indeterminate time in the past and disposed of those drugs, leaving some residue behind; perhaps he merely sat on a contaminated surface such that his clothes picked up a detectable scent; perhaps Appellant touched a contaminated item, and Jager could smell the residue on his hands—not a far-fetched possibility given the pervasiveness of the drug odors in his dormitory building. These, however, are all merely possibilities, and the Fourth Amendment operates as a bulwark against governmental intrusions based on what is simply possible. Instead, probable cause requires establishing a fair probability that evidence will be found in a particular place. *Nieto*, 76

M.J. at 105 (quoting *Rogers*, 67 M.J. at 165). We would typically give the magistrate's determination great deference, but our conclusion below that SSgt AM prepared his affidavit with reckless disregard for the truth renders that deference inapplicable in this case. Upon our review, even viewing the military judge's conclusions of law and all the evidence on this issue in the light most favorable to the Government, we conclude Col PN was lacking probable cause to believe evidence of drug use would be found in Appellant's urine. The military judge abused his discretion in finding otherwise.

## B. Waiver

The Government argues that even if probable cause was lacking to authorize the seizure and search of Appellant's urine, the good faith exception in Mil. R. Evid. 311(c)(3) saves the positive results of the urinalysis from exclusion. Appellant's response is the exception is unavailable to the Government due to SSgt AM's reckless disregard for the truth in drafting his affidavit. Before we reach the question of whether SSgt AM recklessly disregarded the truth, we must first determine whether Appellant adequately preserved this issue for appeal.

Our superior court, CAAF, has held that in the context of suppression arguments, an accused must not just make particularized objections to the probable cause supporting the search itself—he or she must also make particularized arguments as to why an exception to the exclusionary rule does not apply. *Perkins*, 78 M.J. at 390. Arguments not made at trial with respect to exclusionary rule exceptions are waived on appeal. *Id.* Amicus Curiae for the Government argues Appellant is precluded from asserting on appeal that SSgt AM recklessly disregarded the truth in drafting his affidavit under the theory Appellant did not raise the issue at trial, thereby waiving the claim.[9] We find Appellant's preservation of the issue a close call, but we conclude he did preserve the matter for appeal.

Amicus Curiae for the Government points out trial defense counsel's argument on the motion largely focused on the existence of probable cause for the seizure and search of Appellant's urine, never using the phrase "reckless disregard" and beginning their motion argument at trial with, "[T]he [D]efense's entire position is that there was not [a] reasonable belief that [Appellant's] urinalysis would be positive based on the evidence . . . ." Amicus Curiae is correct, but we are mindful of our presumption against finding waiver of constitutional matters as well as the fact our superior court has recently held that

[9] The Government does not specifically allege Appellant waived this issue, instead arguing that he provided no evidence in support of the claim SSgt AM recklessly disregarded the truth.

the failure to utter "the talismanic words 'false' or 'reckless disregard for the truth'" is not necessarily fatal to an appellant's ability to attack the good faith exception on those grounds. *Blackburn*, 2020 CAAF LEXIS 405, at *9–11.

Trial defense counsel specifically stated they were not accusing SSgt AM of "any improper conduct." Yet, in that same sentence, trial defense counsel said the affidavit "poses some concerns," then immediately argued the affidavit did not present a "fair picture," some portions of the affidavit were "misleading," and the affidavit would have "maybe" been "written differently" had SSgt AM consulted SSgt PO before drafting it, especially with respect to Jager's capabilities. On one point, trial defense counsel described the affidavit as "just not true." Trial defense counsel further said SSgt AM "left out a lot of important facts" and the affidavit was insufficient, arguing "it just didn't include all of the facts and circumstances of what actually occurred. It included, you know, I don't want to say false, but misleading information and just didn't include the full picture. I don't think that the good faith exception should apply in this case." On appeal, Appellant similarly does not accuse SSgt AM of intentionally including false information in his affidavit, instead arguing that he recklessly disregarded the truth in drafting it. In response to trial defense counsel's motion and argument, the Government argued at trial the Defense had not shown SSgt AM drafted his affidavit falsely or with reckless disregard for the truth, and the military judge included in his ruling his conclusion SSgt AM had not done so.

Although trial defense counsel could have been more precise in spelling out a "reckless disregard" argument for rejecting the good faith exception to the exclusionary rule, the fact both trial counsel and the military judge specifically sought to counter the argument tells us they both understood Appellant to have raised the issue.[10] Moreover, trial defense counsel's characterization of the affidavit as omitting "a lot of important facts," not being a "fair picture," and being—in parts—misleading and "just not true" directly challenged the overall integrity of the affidavit and the affiant. We conclude Appellant's attack on the affidavit at trial adequately asserted SSgt AM recklessly disregarded the truth when he drafted his affidavit and presented it to the magistrate in support of his effort to seize Appellant's urine. Trial defense counsel's disavowal of any "improper conduct" on SSgt AM's part is not inconsistent with our conclusion, as the exception to the good faith rule describes affiants who include information they knew was false *or* information which they would have

---

[10] The fact the Government at trial addressed the "reckless disregard" exception to the good faith rule demonstrates that the Government was not deprived of the ability to present evidence that could be reviewed on appeal, a primary reason for insisting on particularized objections at trial. *See United States v. Stringer*, 37 M.J. 120, 132 (C.M.A. 1993) (Wiss, J., concurring in the result).

known was false but for their reckless disregard of the truth. The former calls for an intentional misrepresentation of the facts, whereas the latter requires only recklessness, which is characterized by disregarding foreseeable consequences. *See, e.g., United States v. McDuffie*, 65 M.J. 631, 635 (A.F. Ct. Crim. App. 2007) (citation omitted). A review of the argument trial defense counsel made at Appellant's court-martial leads us to conclude Appellant has preserved this issue for appeal.

**C. Good Faith**

Although Col PN lacked probable cause to order the seizure and search of Appellant's urine, the results of the urinalysis would still be admissible if the Government can establish that an exception to the exclusionary rule applies. Here, the Government contends the good faith exception should preserve the admissibility of the evidence. Appellant argues the exception should not apply because SSgt AM executed his affidavit with reckless disregard for the truth. We agree with Appellant.

Under *Leon*, the good faith exception does not apply when a magistrate is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." 468 U.S. at 923 (citations omitted). This implicates the third prerequisite for finding the exception under military law: that the person seeking and executing the search authorization "reasonably and with good faith relied on the issuance of the authorization." Mil. R. Evid. 311(c)(3)(C); *Carter*, 54 M.J. at 421. In this case, SSgt AM included false information about Jager alerting on Appellant's door. He also omitted the fact the dormitory building reportedly smelled of marijuana prior to Appellant moving in. He further omitted the fact that Jager's handler told him that a dog alerting on a person was out of the ordinary and "not usual." He did not include any discussion of the fact that not only did Jager have no demonstrated capabilities with respect to searching and detecting controlled substances on people, Air Force regulations entirely prohibit using military working dogs to search people. Under the circumstances, such information is the kind of information a reasonable person would have known the magistrate would have wanted to know. *See, e.g.*, *Blackburn*, 2020 CAAF LEXIS 405, at *10–11 (citation omitted). This is so because it would have likely led a magistrate to inquire into what a dog's capabilities are with respect to detecting drugs or residual odors on a person.

As discussed above, had SSgt AM included the fact the dormitory resident who identified the dates she smelled the odor of marijuana in the building, the magistrate would have understood the odor did not inculpate Appellant. By selectively including only the date after which Appellant moved into the dormitory, SSgt AM created a misleading factual scenario in which it appeared Appellant moved into the dormitory and within just a few days, the building

began smelling of marijuana. The implication, of course, is that Appellant was tied to the introduction of the odors, because no evidence was presented to Col PN that the odors predated Appellant's arrival. Based upon the affidavit as it was written, a reviewing magistrate would be led to believe Appellant was the source of the odors; that is, that he was smoking marijuana in the building, and that he persisted in smoking marijuana through SrA AC's detection and reporting of the odor a month later. Although there was nothing false about the fact in the affidavit that the building smelled like marijuana after Appellant moved in, the omission of the fact it smelled that way *before* he moved in was highly misleading, as that second fact refutes the implication that Appellant was using marijuana. By any measure, a reasonable person who heard Appellant's dormitory building smelled like marijuana shortly after he moved in would want to know that the odors did not first arrive after Appellant moved in, but were actually present before he did so. By extension, a reasonable person would understand a magistrate being asked to authorize a seizure and search based, in part, upon odors allegedly corresponding with Appellant's arrival at the dormitory would want to know the odors were there prior to that arrival. Withholding such plainly relevant information in this case amounts to a reckless disregard for the truth, which was that the odors preceded Appellant's arrival. As a result of SSgt AM excluding this information, Col PN was misled to incorrectly believe the odors were only noticed "the day after [Appellant] moved back into the dorms."

SSgt AM also excluded from his affidavit the fact Jager had no demonstrated capability of identifying the scent of drugs in or on a person as well as the fact military working dogs are prohibited from being used to search people at all (leading to the inference they do not train to do so). At the time Jager sat in front of Appellant, SSgt PO told SSgt AM that Jager does not normally alert on people and that his alerting on Appellant was "not usual," yet SSgt AM made no mention of this in his affidavit. Instead, SSgt AM simply noted in his affidavit that Jager "immediately sat and stared" at Appellant twice without amplifying the meaning or limitations of this alert. As is the case with the fact a dormitory resident detected the odor of marijuana after Appellant moved in, there is nothing false about the fact Jager sat and stared at Appellant. What is absent from the affidavit, however, is the surrounding context of Jager sitting and staring at him. A reasonable person would want to know what a working dog's capabilities are with respect to being able to detect drugs in or on a person when confronted with such a situation as presented here. While SSgt AM, who was not Jager's handler, may not have ordinarily known many specifics about Jager's training, capabilities, and permitted uses, SSgt PO told SSgt AM at the time of the search that Jager's actions were "not usual" and that it was abnormal of him to alert on a person. Despite being aware of this

anomaly, SSgt AM left the information out of his affidavit. Had it been included, the magistrate would have been put on notice to inquire further about the meaning—or lack thereof—of Jager sitting in front of Appellant, and what that said about the likelihood of finding evidence of drug use in Appellant's urine.

SSgt AM further included incorrect information in his affidavit by asserting Jager alerted on the door to Appellant's room on two different occasions. This claim was specifically rejected by SSgt PO, leading the military judge to similarly decline to find it had been shown by a preponderance of the evidence. The inclusion of these two claimed alerts was misleading in that it both further connects Appellant to drug activity and sidesteps the infirmity of Jager alerting on Appellant himself. The Government has suggested the theory that Jager's alert on Appellant is indicative of Appellant's recent use of drugs, the theory being that Appellant had consumed some amount of a drug and left remnants or odors of the drug behind on his clothes or person. Yet, Jager failed to alert inside of Appellant's room, undermining the Government's theory to a degree, at least insofar as the theory involved Appellant using the drugs in his room. If Appellant had, in fact, consumed drugs in his room leaving some telltale residue or odor on his person, one would expect Jager to have similarly alerted in or around Appellant's room, especially given that the entire premise of the investigation was that someone was smoking marijuana inside the dormitory building. This highlights the significance of the erroneous claim that Jager alerted twice on the door to Appellant's room: it suggests evidence of the presence of drugs not just on Appellant's person, but in the immediate proximity of his room as well, resolving the doubt arising from Jager not alerting inside Appellant's room. With the inclusion of these standard (but untrue) alerts on Appellant's door, one would more readily conclude that Appellant had recently consumed drugs—leaving traces of a drug near his room—and that the evidence of that use was likely to be found in Appellant's urine in light of the fact no drugs were found on Appellant's person or in his room. Without these alerts on the door, however, the magistrate was left with nothing more than Jager's problematic alerts on Appellant himself.

Taking the purported alerts on Appellant's door, the alerts on Appellant's person, the pervasive smell of marijuana in the building, and the claim the smell only appeared once Appellant moved in all together would lead to the fairly natural conclusion that Appellant was smoking marijuana in the dormitory building. But one only arrives at that conclusion by virtue of SSgt AM both omitting important information diminishing the significance of the facts he did include and including erroneous information that overstated the case for concluding Appellant had recently consumed drugs such that a seizure of Appellant's urine could be validly authorized. Moreover, we need not hypothesize as to whether the magistrate considered these matters—Col PN testified he did,

saying that he based his authorization on "[t]he fact that the dog sat on [Appellant's] floor, and sat when he came out, and sat each time it passed his room, and then on the second floor that someone actually could—said that the smell of marijuana started the day after he moved back into the dorms."

We conclude SSgt AM was not simply negligent in drafting his affidavit. With respect to the odors in the dormitory building, SrA AC testified he told SSgt AM about the dormitory resident who said she smelled marijuana in the building both before and after Appellant moved in. We have little reason to question SrA AC's veracity on this point, as SrA AC documented the two dates the resident said she smelled marijuana in his notes which he was taking at the time of the search. SSgt PO testified he told SSgt AM that Jager's alert on Appellant was unusual. No witness or other evidence supported SSgt AM's claim Jager alerted twice on Appellant's door; in fact, SSgt PO specifically rejected this claim. Assuming SSgt AM did not intentionally include false information about Jager alerting on the door, we find his failure to confirm this information with SSgt PO—Jager's handler—prior to executing his affidavit to be a reckless disregard for the truth of the matter. Considering the affidavit as a whole, we find it to be crafted in such a way as to focus the magistrate's attention on Appellant, to overstate the facts supporting a conclusion that Appellant was using drugs, and to minimize or omit information that would give rise to obvious reasons to doubt the allegation. As a result, SSgt AM's affidavit painted a wholly inculpatory picture, misleading Col PN in his determination of probable cause to grant the search authorization in spite of the shortcomings in the factual basis for doing so. We conclude SSgt AM drafted his affidavit with a reckless disregard for the truth, and it was clear error for the military judge to conclude otherwise.

## D. Exclusion

In spite of the unlawful seizure and search in this case, the resulting evidence will still not be excluded unless such exclusion "results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a). Based upon the facts here, we conclude exclusion is appropriate. SSgt AM's reckless disregard for the truth in drafting his affidavit led to the involuntary seizure of Appellant's bodily fluids and the subsequent analysis of those fluids for evidence of criminal conduct. As a result, Appellant was forced to turn over the evidence which incriminated him, evidence which was contained within the sanctity of his body. Despite the fact military members are routinely called upon to provide urine samples in order to maintain military readiness, these members do not forfeit their rights under the Fourth Amendment by virtue of volunteering for military service. Breaching a person's bodily integrity in order to search for evidence is a substantial invasion of an individual's right, and

such an invasion must be based upon probable cause absent extenuating circumstances not presented here. This calls for a scrupulous adherence to the procedures for obtaining a search authorization, which—at the very minimum—means insisting upon supporting affidavits prepared with due care and without a reckless disregard for the truth. The deterrent effect of excluding the evidence in this case is significant, as it will serve to reinforce the seriousness of seeking search authorizations which grant permission to overbear servicemembers' constitutional protections without misleading the magistrates charged with upholding those protections.

The cost in excluding the evidence in Appellant's case is comparatively less. Although drug abuse by servicemembers is criminal, Appellant's case involves a single use of a controlled substance with no apparent impact on his unit or the military mission. We are also mindful of the fact Appellant had been convicted at a prior court-martial and sentenced to a punitive discharge, and the appellate review of that trial is complete, having upheld both his conviction and his sentence.[11] His misconduct occurred during a period after his release from confinement, while he was awaiting placement on appellate leave, and during or just after a period of weeks in which he was assigned no military duties. Although this timing does not excuse Appellant's misconduct, it places it in context and reveals it as distinctly non-aggravated, which, in turn, diminishes the costs to the justice system. Weighing this relatively low cost against the paramount importance of safeguarding servicemembers' constitutional rights, we conclude exclusion of the results of Appellant's urinalysis is the appropriate and just outcome.[12]

## IV. CONCLUSION

Appellant's conviction was based solely upon the results of his urinalysis. Therefore, we cannot conclude Appellant would have been found guilty of the sole specification he was charged with in the absence of that evidence. The finding of guilty to the Charge and Specification is **SET ASIDE**. The sentence is **SET ASIDE** and the case is returned to The Judge Advocate General for

---

[11] *United States v. Hernandez*, No. ACM. 39346, 2019 CCA LEXIS 15 (A.F. Ct. Crim. App. 16 Jan. 2019) (unpub. op.), *rev. denied*, 79 M.J. 61 (C.A.A.F. 2019).

[12] Because our decision in this case results in the sole specification being set aside, we do not address whether Appellant is entitled to relief for post-trial delay under either *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). Should Appellant's case return to us, we will consider the issue of delay at that time.

remand to the convening authority. A rehearing may be ordered, or, if a rehearing is deemed to be impractical, the Charge and Specification shall be dismissed.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court